The first argued case this morning is the first of the Apex Frozen Foods v. United States Cases No. 15-2085. Mr. LaFranchi. Good morning. May it please the Court. Again for the record, my name is Robert LaFranchi, the law firm of Crowell & Loring, appearing today on behalf of plaintiff's appellant Apex et al. Your Honors, the Commerce Department unlawfully applied its targeted dumping methodology in this case. Now, we raised several issues in our brief about this, but I'd like to focus today on one issue in particular, and that is the Commerce Department's unlawful use of zeroing as part of its threshold meaningful difference analysis. Now, I know the Court has dealt with zeroing many times in the past, but that has been in a different context, which is mostly in the context of the margin calculation. What we're talking about here primarily is the use of zeroing earlier as a threshold determination to see whether they can use zeroing later as part of the calculation. So is the issue the use of zeroing, the fundamental issue? That is one of the fundamental issues in terms of part of the meaningful difference test, Your Honor. So zeroing is used twice. The Commerce Department is using it as a threshold determination as part of its targeted dumping analysis to determine which methodology to employ, the alternative methodology, A to T with zeroing, or its normal methodology, A to A without zeroing. So one of the arguments we're making is that it's fundamentally unfair, it's unreasonable, it's arbitrary, and it's contrary to the statute upon which they rely to use zeroing as part of a threshold determination to decide later whether to use zeroing. We have argued that not only is it contrary to the language of the statute, which talks about the analysis being that you must account for price differences, so you must account for differences in prices before employing the alternative remedy. However, what the Commerce Department is doing is simply accounting for zeroing differences between the two methodologies. That then allows them to use the alternative methodology with zeroing as part of the margin calculation. Now, we have never disputed that the Commerce Department may use zeroing once lawfully deployed as part of its calculation. What we have said is they can't use zeroing the way they're using it in an uneven manner as part of their threshold calculation. So what they're doing is to determine fundamentally... Using it in an uneven manner or using it at all? Using it in an uneven manner, Your Honors. Why don't you explain why that's so? What is the nature of the uneven application? The uneven application is then when they do their median difference analysis, which is a first phase of their targeted dumping analysis, to decide whether they can use their alternative methodology. They compare the normal calculation, which is the average-to-average methodology, without zeroing. They run the calculation. They run the margin without zeroing, which means they use offsets. They then get a result, which in this case was zero, when they run the calculation on all sales. They then run the alternative calculation, which is their A-to-T methodology, which is what they're trying to use if there's targeted dumping. And they use zeroing. And by doing that, it inflates the margin. So there will always be a material difference when they do it that way? Absolutely. So what's wrong with it? Well, what's wrong with it is, first of all, we think it's... It does show a material difference. It shows a material difference, but it's other than a situation where every sale was dumped. Why are they looking for a material difference in the first place? Well, they're looking to... Well, that's a good question, actually. What they're trying to find is they're trying to find whether the methodology accounts for significant price differences. And that's where we think they're going wrong. What this methodology is doing is it's simply accounting for zeroing differences. It's not accounting for whether the difference in the margin is attributed to... Whether the methodology accounts for the differences, or whether the marketplace accounts for the differences? Well, this court... The courts have held that what's happening in the marketplace in terms of the reasons for price differences are not relevant to the analysis. So I think what the Commerce Department is determining is whether their methodology... This is the testing... Isn't the case, in this particular case, in both of the two cases, the so-called pattern that they were looking at, whether it was by purchasers, or by region, or by timing, showed a disparity in prices. Some would be above the home market price, some below. Well, what they do... Isn't that what was being shown in that pattern they looked at here? No, the pattern analysis is what they're doing is looking at the comparison of prices only on the U.S. market to determine whether there's a disparity of prices. That's how they see a disparity. That's correct. Right. But what... And isn't... When the statute says whether these differences cannot be taken into account, what Commerce is trying to decide is whether or not that pattern of prices deserve a countervailing duty. Yes or no? Well, in this case, an anti-dumping duty. That's correct. That's the one they say cannot be taken into account using a method. That's correct, although it's a two-part analysis. So the statute is then saying, well, then, you don't know when you... If you apply A to A, you may not get the right answer as to whether or not this pattern deserves a countervailing duty. Well, again, in this case, it's an anti-dumping duty, but that's... Yes. Yes. But it's a two-part analysis. So first, the... How are you going to know whether or not that pattern deserves an anti-dumping duty unless you can measure the domestic prices against the home market prices? Well, that's the ultimate calculation, but at this part, we're in the threshold determination where they're trying to determine... What they're trying to determine is... But isn't in the endgame Commerce's duty to decide whether or not the pattern that... Those differences, if you use the A-A method, whether that answers the question of whether or not this pattern deserves an anti-dumping duty? Yes, that's the ultimate endgame here, right? So first, they have to decide whether there's a pattern and whether it's significant, right? That's one calculation. We're not disputing that part of the calculation. It's the next part to determine what... If... But if you used A to A and A to A suggested you didn't need to have a duty, but the actual sales were ones in which there was a large number of sales in the U.S. market that were below the home market price, the higher sales in the home market would allow... In this market would allow you to mask the ones that deserved an anti-dumping duty, right? Well, and that's right. That's what the analysis should be. Whether... That's precisely the point, right? Whether that pattern of prices... Why isn't the methodology Commerce using answering that question? It's not answering that question because it's not actually getting to whether there's masking going on. There's just an implicit, explicit assumption that there's masking going on. All they're doing is taking two methodologies, running the calculation, and comparing them. What methodology would you use to find out whether masking was actually happening? The methodology we would use is... We don't have a problem with them using the meaningful difference test. We haven't challenged that. That's the test they've come up with. The test that they have devised is to determine whether to use the alternative methodology. They calculate margins alternatively under A to A, which is the way they normally do it, and then under A to T. They decide if there's a meaningful difference between those two margins as they calculate it, which they define as either going from below de minimis to above de minimis, which is what happened here. Then they will then decide that their normal methodology cannot take account of those price differences, and then they apply the alternative methodology. We don't necessarily have a problem with that methodology. What we have a problem with is when they do the comparison, they're zeroing only on the A to T comparison, and not on the A to A comparison. What they're doing is they're allowing offsets on the A to A comparison, which means any time there is a non-dump sale, which has a negative margin, that will reduce the positive dumping margin. How do you zero in an A to A calculation? I'm sorry, Your Honor. You're suggesting they should do zeroing in an A to A? I'm suggesting that they should do zeroing in the A to A as well. How do you do that? I'm not smart enough to understand how you would do that. They've done it for years. In fact, when the statute was first denied- Doing zeroing. Yes. The Commerce Department, the U.S. government only eliminated zeroing recently from the A to A calculation, as well as from the A to T calculation. Well, I'm sorry. No, they used zeroing for a long time. When Congress first enacted the statute- Can you give an example of how you would do it? I mean, I'm not as smart as I may sound about it. I'm asking these questions to try to become educated. Can you give me an example of how you would do zeroing in an A to A transaction? Yes, what you would- To explain how you get an average of when you're using the zeroes. Yes, that's perfect. The whole basis of this argument is rooted in the calculation. You've got either A to A or A to T. Under A to A, which is now the benchmark methodology that commerce uses in all cases, ever since zeroing was found to be unlawful at the WTO, all cases are A to A, average to average. In the home market, you have an average. It's always just an average price. Let me give you the simplest example. You might have a home market price of $12. Let's keep it simple, two U.S. sales, one for $14, one for $10. The A to A, then in the U.S., you would average these two prices together and make $12. You'd have $12 against $12. There would be no dumping there. Okay, but that's not what you're complaining about. No, but what I'm complaining about is... This gets to what is actually masking. What this is getting at is, to make an A to T comparison, you would then split that out to the $14 and the $10 and compare it to the $12. That is true masking. You then split out that comparison to reveal... The average reveals no dumping, 12 to 12. The individual calculation reveals dumping of $2 on one and negative two on the other. That is masked dumping. Now, you would zero that out under A to T by just not counting the negative number. Now, your question, Your Honor, on how you would apply that in an average to average case, that's what offsetting is. The complications are very complicated. They're called averaging groups. The example I gave you is for one control number. That's where the averaging group can be. But you're not complaining about the group averaging either, I gather. We're not complaining about the group averaging. What we're complaining about is that under A to A, if you have three different control numbers, three different... Let's call them averaging groups. Sometimes there could be dumping. Even under A to A, sometimes there's not. Let's say you have one control number where there is dumping and another one where there's not, where it's negative. Now, under A to A, because of the WTO rules and because of what the U.S. government has agreed to, they no longer zero. That's called an offset. You have an offset from a different averaging group. Our view is that that is not masking. That is simply offsetting across averages. True masking is actually the example I gave you with the 10 and the 12 and the 14 within an average. The reason that's so is even... If you look at Union Steel, that case talks about masking being masking within an averaging group. That is also the situation, which was the whole reason that Congress enacted this statute in the first place, was to switch from A to T to A to A. The concern was masking within an averaging group, not across averaging groups. The point I'm trying to make, as I see my time is running out, is that what Commerce is doing, fundamentally, by using zeroing unequally at this first stage of the calculation, they're assuming every offset across averages under A to A is masking dumping. We're saying that's just not true. They shouldn't make that assumption. In your example of the two sales, different customers, 14 and 10, could 10 fit the first requirement for targeted dumping, namely, reflect a pattern of selling at a distinctly low price to a particular customer? It could reflect the pattern, although... If you then used the statutory language for A to A, by definition of which, in which there is no zeroing, the statutory language is just weighted averages of the various prices, then that would disappear. That would disappear under A to T. So it wouldn't be... No, I just said under A to A. Oh, I'm sorry. Under A to A, it would not disappear because it would remain averaged. So you would have identified the 10 as a targeted group, and then you would average and get a zero margin. There's something wrong with that. No, in fact, that's exactly the point, Your Honor, which is that if they do that correctly, which is they compare... Let's just keep our simple example. A to A of 12, and you break it out to the 10 and the 14. That's true masking. We don't have a problem. And they should... I just want you to concentrate on the statute. I don't care about the true masking. The statute says you've identified a pattern, and we don't have a dispute about that here, right? We do not have a dispute. Nails here, and in the other case, the other test, but there's a separate sub-market. Are we allowed to say what that is here, or is that secret? That this is a time period target group? Yeah, that's fine. Yes. And then we're talking about the second requirement. Can Commerce explain why the difference between, in your case, the 14 and the 10, can't be accounted for by simply taking what the statute refers to as comparing the weighted average of the normal values to the weighted average of the export prices? So now we're just averaging the US prices. How does that take account of the fact that we've already identified the 10 as a separate targeted group under the pattern language? Well, we would argue that by comparing the two different margins, which is what they're doing, right? They're taking the results under A to A and under A to T. That difference within the average, they can account, they do account for by switching to A to T. They split it out, and it reveals that individual dumping that A to A would not reveal. And so they do the comparison. Well, I truly may be confused, and I'd love to be enlightened. 10 and 14, home cost is 12. 10 is identified as a pattern of disparate prices under the B1I or something like that. So that's a targeted customer. If it's identified as such, correct. And then the second step is, if you just do statutory A to A, which is simply averaging 14 and 10, you're going to come up with a zero dumping margin, right? Because the average would be 12, and the whole market price was 12. That's correct. So how could that possibly account for what you've already determined to be the 10 as a target? We're saying within that average, that's the correct way to do the comparison. So it would, in fact, disappear. And you would be using the averaging, the overall averaging method, so as to say, we determined that there was a targeted customer, but nevermind, no duty. Yes, within the average, that's okay. What we're saying is that happens maybe 50 times, 1,000 times. You have all the different control numbers. In your example, there were two. That's correct. You just explained that your position results in a finding that the 10 is a target, but zero dumping margin. That seems to me to undermine whatever your methodological point is. There should be a separate dumping margin for the 10. For the difference between the average calculation, which is the 12 to 12, and the transaction specific, right, split out within that control number, that's correct. What we're saying is that what Commerce is doing is looking at all of the other, that's just one example, but because there's averaging groups by all the different control numbers, this may happen 20 more times. In another situation, because it's what happened here, there may be a situation where there is no masking at all within an average. That would be, if I take the same example, let's make it 14, 14, and 14. That's what all average is, 14. That would show no dumping, plus negative four, actually. If you broke it out to the transaction specific, it would still be 14, 14, and 14. In that situation, it would still be revealed. A to A would take account. A to A would work, because when you average 14, 14, and 14, you come up with 14, and that's above 12, and there's no call. We argue that works, and what it's showing is negative dumping in that situation. What Commerce does is, in that situation, when they do the comparison between A to T, they just set all those back to zero without actually considering whether there was mass dumping or not. In a sense, they are- You're going to set what back to zero? What number do they set? They would set the negative dumping margins to zero. In that example, the second example I gave you, which would be 10 to 14, 14, and 14, that would be a negative dumping margin, because there's no dumping. It's 10 minus 14. Setting that back to zero would be correct. No, but under the A to A, the negative 14 is counted as negative 14, but what Commerce does is, in the A to T, they set all those equal to zero. The point is, they're making an assumption that there is masking across the averaging groups, when in fact, that may or may not be true. In fact, our position is it's not true, that masking, according to the SAA, which talked about concealed dumping within an average, and Union Steel, which talked about mask dumping within an average. Let's hear from Commerce to pursue the same issue, because it's been troubling. We get objections to zeroing with all sorts of goods that are imported, and this is helpful. You'll have more time. Okay. Mr. Kerman? Thank you, Your Honor. Okay. Do you agree with the explanation of zeroing? Well, Your Honor, I agree that the way zeroing works ... Well, first of all, may it please the Court. We agree that the way that zeroing works is by zeroing out negative margins, but no, we certainly don't agree with Apex's arguments. First, to deal with the meaningful difference issue where they concentrate their comment, Appellant's zeroing inconsistency argument on this issue fails to acknowledge ... Let's pursue the topic that we've been on, on zeroing and the effect on the bottom line, the final answer. Right. Well, I'm sorry, Your Honor, that's exactly where I was going. The whole point of considering applying the A-to-T methodology with zeroing is that it reveals dumping that is otherwise masked by the averaging and offsetting features of the A-to-A methodology, and I can briefly try to clear up some information about the history of the A-to-A methodology, because it goes directly to this Court's precedence in U.S. Steel and ultimately Union Steel. The headline on those precedents is that both of them, even though the type of zeroing arguments were slightly different, the rationale for both decisions was that Commerce was using zeroing with the A-to-T methodology and not using zeroing with the A-to-A methodology, and the whole crux of the reasoning there was that it's okay for Commerce to continue zeroing with A-to-T while not continue zeroing with A-to-A. A-to-A used to incorporate zeroing now more than a decade ago. Commerce ceased zeroing as a result of WTO decisions. That resulted in this Court's decision in U.S. Steel. Can you explain to me how do you include zeroing in A-to-A if A-to-A is meant to mean the same thing as what's in 1677 F1D AI? Sure, Your Honor, but it's important for me to note that that is 100 percent not the way the A-to-A methodology works. There's no world in which Commerce would apply the A-to-A methodology with zeroing today. It ceased zeroing in A-to-A methodology a long time ago and doesn't do a statutory question, not something called A-to-A, which is not in the statute. So I'd like you to explain to me how this statutory language means anything other than simply comparing the weighted average of the normal values of the home country to the weighted average of the export prices. It's not in that particular statutory provision. What this Court has ruled previously is this particular statutory provision is utterly silent about when making those comparisons whether Commerce should be using zeroing or not. What this Court's jurisprudence is focused on is a section of the statute, I believe it's 1677.35. It's certainly cited in the background legal discussion in our brief where it talks about the dumping margin exceeding the normal value, exceeding the export price, and this Court's longtime precedence going back to a Timken case in 2006 were about whether... There was a lot of deference and particularly it came up in extraordinarily complex fact patterns of importation. Let's talk about this case and how it applies and also if it's not being used anymore for the 7th and 8th Administrative Reviews, it was used apparently. Well so that's the whole point. Now that the A-to-A methodology does not incorporate zeroing, the fact that the A-to-T, it's even more important that Commerce is continually able to use zeroing as part of the A-to-T methodology because now that the A-to-A methodology both incorporates averaging and offsetting, the type of offsetting that Your Honor has discussed with counsel for APEX is exactly what Commerce is seeking to combat. That's why and that's been extremely well established in both this Court's and the Court of International Trade's jurisprudence. That is why Commerce uses the A-to-T methodology with zeroing. In particularly, both U.S. Steel and Union Steel recognized that zeroing is inextricably linked with the A-to-T methodology. So the whole idea is that the methodologies are different. That's why you're using the dumping that would otherwise be masked by the offsetting feature. Let me, again, you're going to have to keep correcting me about these things. But it seems to me a really simple version of your argument about the account for is that what the statute is referring to is what's in that little I thing that we referred to and which is no zeroing. And if you don't have zeroing, you're going to simply lose the fact that you've identified the target market or target customer, target time period, and you win. Easy. But if you start saying, oh, well, this A-to-A can have lots of varieties, some of which include zeros, then I don't understand why none of them can take account of this. So, Your Honor, we 100% agree with your reasoning. And I need to emphasize again, commerce does not apply the A-to-A. It's not part of commerce's lexicon today to apply the A-to-A methodology with zeroing. In a past world, it's not that particular statutory provision that the court has interpreted the statute generally is ambiguous with respect to zeroing. But no one here argues that commerce ever applies the A-to-A methodology with zeroing. It doesn't do it. And that's why Your Honor's reasoning is exactly correct. Because the way commerce applies the A-to-A methodology and the way that APEX would want commerce to apply the A-to-A methodology ultimately is with the offsetting that masks the actual dumping that was revealed here with the A-to-T method. And that's one important thing for us to note. Your adversary is not asking for the use of A-to-A with zeroing, is he? No. And if he was, that would be totally inappropriate. It's confusing how this got into our argument here today, the notion that someone wants to zero inside of A-to-A mathematics. He has argued, to be fair to him, he has argued that the appropriate way to compare the A-to-A and A-to-T methodologies might be using A-to-A with zeroing. But that's totally illogical. That's not how it's applied. And the whole thing, he would be... What is your take on the nature of his complaint? He said here that he's arguing about the use of zeroing at the front step when you're looking for meaningful differences. That's what I understood. That's right. He doesn't object to using zeroing at some later point in time to take with a masked transaction and to peel it out so it becomes subject to a countervailing duty. That's right. And what Congress is doing here is simply... You understand him to be saying if you're going to use zeroing in A-to-T at the front step, then you have to use zeroing in A-to-A. Is that what he's saying? I understood him to be arguing that. And I think that's completely illogical because it's not how it works. And it's defeating the point. I mean, of course, if you use zeroing in A-to-A, you end up revealing a bunch of dumping. But that's the whole point. It's dumping that's masked in the normal way that commerce applies A-to-A. And to that point, and on that point, I would commend your honors to page 20-23 of intervener ad hoc shrimps intervener brief where they listed for three pages quite a number of cases where the agency applied the meaningful difference test just the way it does here and determined that there was not, in fact, a meaningful difference between A-to-A and A-to-T methodology. So it doesn't always result in a finding of a meaningful difference. Can you give a simple schematic, just an example? I don't mean pointing to a case. Just talk about an example in which, under your view, the account for provision might actually result in deciding, oh, this does account for. Sure. Those are all the cases at 20-23. I don't want to hear about reference cases. I want you to explain it in some sort of numerical example like his 10-14. Sure. Well, for example, you could have an instance where even though there's a pattern of targeted dumping that has been identified, when you ultimately apply the A-to-T methodology, it doesn't end up being in a meaningful amount. For example, it goes from point zero to. The statute doesn't talk about A-to-T. It says, let's use A-to-A as a shorthand for the statutory phrase. It doesn't account for it. Show me an example where, in your view, it could account for what you've already determined by the NAILS test, by the Cohen's d-test, to be a separate target area. Sure. Let's say you have two targeted sales and everything else is not targeted. The difference between the A-to-A and the A-to-T method that you're going to get, even if those couple sales end up passing the NAILS test, are not going to result in a meaningful difference between A-to-A and A-to-T. As a result, Congress would not determine that A-to-A could not account for the dumping. Or, if a party is not engaging in dumping, if there's a pattern of significant price differences, but it turns out that it's not actual dumping, they could... They're all 14. Well, or maybe they're all above the normal value. That's what I mean. Yeah, exactly. Then you use A-to-A and A-to-T. And there have been definitely a reasonable number of instances, not all of which, but a number of which are set forth in page 20 to 23 of Ad Hoc's Room's brief, where Congress has applied the same analysis and said, you know what? We don't see a meaningful difference. A-to-A is accounting for the pattern we found here. You can meet the pattern test even if every price is an overprice. You can because the pattern test in Congress... It's all internal to the comparisons of the U.S. prices. It has nothing to do with the home market price. Well, that's right. And Congress has said that in a number of places here, where Congress is just determining whether... That's what the statute says. That's right. And following the statute, Congress has articulated in its reasoning one question on this. Hey, we're not... At the pattern stage, we're not looking at dumping. We're looking at the statutory criteria of whether there's a pattern of significant price differences, which... And the SAA is very clear on this at 843. It says it may mean that there's targeted dumping. Similarly, the statute doesn't say the differences. It says such differences. So the pattern serves as kind of a red flag that, hey, we see a pattern. There seems to be targeted going on here. It's only when Congress ultimately applies the methodology that it determines the dumping because that's where it's comparing U.S. prices and normal values to actually calculate a margin. And so that thus applies A to A, and it comes up with a number that applies A to T, comes up with a number, and if A to T is bigger, then they say A to A didn't catch. That's right. And one last point on that. That goes to this court's decision in U.S. Steel, where the appellants in U.S. Steel were complaining that that's when Congress had stopped zeroing in A to A, and the appellants... Those were different facts. We never held that zeroing that applies in certain cases, therefore, is immunized from scrutiny no matter what the facts might show. I understand, Your Honor, but what this court said is it recognized that Congress still intended to apply zeroing when it used A to T methodology, even though it was stopped. We recognized that zeroing was a shortcut, and we deferred to the agency. Understood, Your Honor. Likewise here, it's appropriate to defer to the agency because it's reasonably using zeroing to reveal mass dumping as it has continually for at least going back to U.S. Steel. Okay. You've shared your time with Mr. Butler? Yes. Thank you, Your Honor. Okay. Mr. Butler, tell us who you're representing. I'm Philip Butler, defendant appellee, American Shrimp Processors Association. Okay. Can you bring some practicality to the generalizations we've been discussing? Sure. I guess I would want to start with an argument that actually Commerce made, and it's brave. And one thing that was reasonable for Commerce to apply that A to A without zeroing and A to T with zeroing in the Meaningful Difference Test was that when it actually applies its remedy, it applies A to A without zeroing and A to T with zeroing. Thus, it would seem kind of illogical for it to what it does in its remedy phase not also be used in its Meaningful Difference Phase when it's deciding what methodology it's going to use, whether it's going to use the A to A or the A to T. And I think it's also important to understand that when looking at what the A to T is, I mean, the A to T inherent to the A to T is zeroing. So we can't really ask Commerce not to zero in this methodology because that is what the methodology does. It zeroes, as opposed to the A to A methodology, where they do not zero. I think it's also important to say that when we're talking about what we're trying to do is we're trying to decide whether there is mass dumping. And this Court has decided that it is zeroing that reveals the mass dumping. And it is the A to A methodology without zeroing that actually does mask the dumping or the price differences in this case. Is there anything I can help you with? The answer probably is it's very strange. It's a shortcut that we've accepted in certain complex cases. Here it's being brought to us in a very tangible form. The result is different with and without zeroing, I gather, in these cases. And that certainly is a matter of concern with respect to statutory compliance. Yes, I understand. But again, zeroing is not necessarily a shortcut, I don't think. I think zeroing is just a methodology that actually reveals what's going on, what's going on underlying when you have an A to A methodology, which is obviously taking these higher prices and taking lower prices and averaging them. You're not able to see then, well, is there targeting going on? As opposed to the A to D methodology with zeroing, you can then see, OK, here's a price. We're not going to zero it. I'm sorry, we're going to zero the upper prices so that we can really figure out, OK, what's going on down below? Where is there dumping? And how can we be sure that that's not being masked by prices above? OK, thank you. Can I just double check? I mean, you agree that the identification of a distinctive area, I'm going to try as hard as I can to avoid the term target, because target does seem to import some notion of underpricing. But the definition, this pattern thing, could be a identified area in which there is, for comparison, underpricing compared to other pricing of the same exporter. But it has to be on comparable or the same products. Yes, of course, on the same products. I'm trying to make a distinction between what the pattern is about, which is a pattern within U.S. prices. And that says nothing at all about the relation of those U.S. prices to the prices in the home country. That's correct. OK, so what's the relation between the account for that internal U.S. disparity? What's the relation of that language, account for the internal U.S. disparity, have to do with the relation between the U.S. prices and the home market prices? Well, again, you're looking at the price differences in the U.S. That's the pattern. That's the pattern. Or paragraph or whatever. And so you have, obviously, upper prices, you have lower prices. Yeah, lower than the upper, but still possibly higher than the home. Possibly, sure. Yes. Yes. And then you can then determine whether there's a pattern, meaning a difference between the two. And then... Right, so prices in California are one standard deviation away from prices in the rest of the country. So far, we haven't said whether there's any dumping anywhere. Well, if you have... OK, sure. Yeah, you could do that. OK, now explain if that's what the pattern is, what's the range of permissible meanings of AA cannot account for that? Because AA, you've now suddenly introduced something about the relation to the home prices. OK, so then when you're doing your dumping margin, yes, you do introduce the home prices when you're on that next phase. OK, well, let's figure out what the dumping margin is. But in the case that I think that you were just talking about, prices were higher. I'm sorry, you did say lower. If they were lower, then yes, you could say, OK, well, is there dumping in California? Versus some other places, is it a regional difference? And then you'd have higher prices someplace else. You say, OK, well, here's what the pattern is. Now, in order to make sure that those higher prices in another region do not mask those dump prices in California, we use the A to T methodology without zero. Does that answer your question? That's fine for now. Thanks. OK. Thank you. Thank you, Mr. Butler. OK, let's see. Suppose I announce, come forward. Suppose I announce the next case, and we'll proceed. I assume that the issues of the Seventh and Eighth Administrative Review are the same. Is that correct? There's some overlap, and some of the issues are unique. OK, well, then I'll ask you what the difference is. So let's call numbers 16, 17, 69. Again, Apex frozen foods against the United States. And let's proceed.